# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) MANDY and (2) JAKE CALLIHAN, )
individually and as parents and next friends )
of CNC, a minor, )
                 )
         **Plaintiffs,** )
                 )    **Case No. 16-CV-525-JHP-FHM**
**v.** )
                 )
(1) INDEPENDENT SCHOOL DISTRICT )
NO. 1 OF DELAWARE COUNTY, )
OKLAHOMA, )
                 )
         **Defendant.** )

## OPINION AND ORDER

Before the Court are the Motion for Summary Judgment with Combined Brief in Support of the Defendant, Independent School District No. 1 of Delaware County, Oklahoma (the "School District") [Doc. No. 35], Plaintiffs' Response in Opposition to Motion for Summary Judgment [Doc. No. 59], the School District's Reply [Doc. No. 76], as well as Plaintiffs' Supplemental Response [Doc. No. 86], and the School District's Reply to Plaintiff's Supplemental Response [Doc. No. 90]. After review of the briefs, and for the reasons stated below, the School District's Motion for Summary Judgment is **GRANTED**.

## BACKGROUND

### A.    Procedural History

On August 9, 2016, the Plaintiffs, Mandy and Jake Callihan, individually and as parents and next friends of C.N.C., a minor, brought this action against the School District. The Plaintiffs alleged a claim for violation of 20 U.S.C. §§ 1681-1688 (Title IX of the Education Amendments of 1972). The Plaintiffs also asserted claims under 42 U.S.C. § 1983 for violation

of C.N.C.'s Fourteenth Amendment rights to equal protection, substantive due process, and procedural due process.

## B.    Factual Background

In the summer of 2013, the School District hired Cory Henton as a teacher and girls' basketball coach. A School District representative was told by Henton's prior employer that Henton was not eligible for rehire. However, the School District representative was also told that Henton's ineligibility for rehire was not the result of a conflict with children.

During the 2013-14 school year, Henton's first year of employment with the School District, C.N.C. was 13 years old and a student in the eighth grade at the School District's middle school. Henton coached C.N.C.'s eighth grade basketball team, and he was also the assistant coach for her cross country and track team. Henton did not have any inappropriate contact with C.N.C. during the 2013-14 school year.

In September of 2013, Tammy Cornell, a teacher employed by the School District, was notified by another teacher that Cornell's daughter, who was a sophomore in high school and a member of the basketball team, had asked to be excused from class to go to the gym to shoot hoops with Henton. Cornell declined to approve her daughter's request, and she and her daughter met with the teacher, Henton, and James Bryant, the high school principal and athletic director for the School District. During this meeting, it was revealed that Henton and Cornell's daughter had been texting each other about going to the gym to shoot hoops. Bryant told Henton not to send text messages to individual players and to send only group texts to the entire team.

During the 2013-14 school year, Michelle and Greg Wilson's daughter was a junior on the basketball team. In November of 2013, the Wilsons learned that Henton had told their daughter that she could not attend the first scrimmage of basketball season. The Wilsons and

their daughter went to the high school and met with Bryant. During this meeting, the Wilsons' daughter told Bryant that Henton sent text messages to individual players and talked about the girls' butts during basketball practice.

Bryant investigated these allegations and interviewed four (4) members of the girls' basketball team. The players reported that Henton sometimes sent text messages to individual players, but they stated that the messages always related to basketball. The players told Bryant that during basketball practices, Henton sometimes talked about girls using their butts to block out other players or get position for rebounds.

Bryant then met with Charles Thomas, the Superintendent of the School District, and informed him of what he had learned. Thomas and Bryant met with Henton and questioned him. At the end of this meeting, Bryant gave Henton a verbal reprimand not to send text messages to any individual students.

Tammy Cornell and Michelle Wilson are close friends. They did not like Henton because of the way he treated their daughters. As a result, they watched everything that Henton did and made sure their daughters told them everything Henton did or said.

In December of 2013, Tammy Cornell was at a basketball practice and observed other players picking on Michelle Wilson's daughter. Cornell went to Thomas's office and told him that she was concerned about the way Henton was running the basketball team. Cornell subsequently sent Thomas an email identifying all of her concerns. Cornell believed that Henton displayed favoritism and did not treat all of the players the same. Cornell also complained that Henton had been critical that some of the clothing her daughter wore in public was immodest. Finally, she complained that Henton had made a comment to her daughter indicating that he

believed a scratch on her neck was a "hickey." Cornell believed Henton was insinuating that her daughter was sexually promiscuous.

On January 7, 2014, the Wilsons met with Thomas and complained that their daughter was being bullied by other players on the team. They said they believed their daughter was being "exiled" from team activities because they had complained to Bryant about Henton. They also believed that Henton was retaliating against their daughter by reducing her playing time in games.

In response to the complaints he had received, Thomas met with Jan Fasano, the assistant high school principal, and directed her to make a random list of some of the students on the girls' basketball team. He specifically directed her to include Cornell's daughter and the Wilsons' daughter on the list. Thomas and Fasano then prepared a set of questions and individually questioned each girl on the list. They prepared a written summary of the girls' responses.

On January 24, Thomas met with the Wilsons and gave them a five (5) page letter detailing the results of his investigation. Thomas noted that Bryant had done an investigation into the Wilsons' allegations in November, and Thomas pointed out that because the Wilsons were dissatisfied with the results of that investigation, he had then done his own investigation into their allegations. Thomas acknowledged that Henton had made some mistakes, but he found those mistakes to be innocent and minor. Thomas concluded that the Wilsons' allegations that their daughter was the target of retaliation and/or deliberate mistreatment were unfounded.

The Wilsons' daughter ultimately quit the basketball team and transferred to another school district. She returned to the School District for the 2014-15 school year but did not play basketball.

Neither Cornell's daughter nor the Wilsons' daughter ever accused Henton of any inappropriate touching. Neither Cornell nor the Wilsons ever suggested to anyone at the School District that Henton was trying to have an inappropriate relationship with any player or student.

Tammy Cornell was aware that as a public school teacher, Oklahoma law required her to report any suspected sexual abuse of a child to the Oklahoma Department of Human Services. Tammy Cornell did not make any report to DHS about Henton because she did not suspect that Henton was sexually abusing any child.

Sheila Sturges was Henton's assistant coach during the 2013-14 school year. She requested to stop coaching with him because they had a personality conflict and had different coaching styles. Sturges never observed Henton say or do anything that caused her to suspect that he would have an inappropriate relationship with a student.

During the 2014-15 school year, C.N.C. was a freshman at the School District. Henton was head coach of both the girls' freshman team and the girls' high school varsity team. Lindsi Crawford was Henton's assistant coach for both teams. C.N.C. was a starter on the freshman team and played some on the high school team.

During Christmas break of the 2014-15 school year, Henton sent C.N.C. a friend request through a game called Trivia Crack. Trivia Crack allowed players to message each other similar to text messaging. Shortly after Henton and C.N.C. began communicating through Trivia Crack, Henton began to compliment C.N.C., telling her that she was pretty and had pretty eyes.

C.N.C.'s parents had given C.N.C. permission to download the Trivia Crack game on her phone, but they had no idea Henton was using that game to communicate with C.N.C. C.N.C. did not tell her parents or anyone else that she was communicating with Henton. When classes resumed after Christmas break, Henton continued to communicate with C.N.C. through Trivia

Crack. Except for basketball practice, which involved no inappropriate contact, Henton and C.N.C. did not interact with each other at school and communicated exclusively through Trivia Crack.

In February of 2015, Henton suggested to C.N.C. that they communicate through a texting application called Cyber Dust, which would automatically erase their messages. C.N.C. did not ask her parents' permission before downloading Cyber Dust to her phone. C.N.C. did not tell anyone that she was using Cyber Dust to communicate with Henton because she knew it was inappropriate and she wanted to keep it secret.

Henton's conversations with C.N.C. became more personal after they began using Cyber Dust. Henton told C.N.C. that he wanted to kiss her, and they kissed for the first time in March of 2015 at the gym following basketball practice after everyone else had left. After that, they began to hug, kiss, and hold hands when they were alone.

On March 13, 2015, Henton took some of the players on the basketball team on an overnight trip to Oklahoma City to watch the girls' state high school basketball tournament. Henton and C.N.C. had discussed this trip on Cyber Dust, and they had talked about doing more than kissing while they were in Oklahoma City.

C.N.C.'s mother, Mandy Callihan, is an elementary teacher employed by the School District, and she and her husband, Jake Callihan, went on the trip to Oklahoma City as chaperones for the students. The group spent the night at a hotel, and C.N.C. shared a room with her teammates. Jake and Mandy Callihan stayed in a separate room. Around midnight, Mandy Callihan sent a text to C.N.C. to make sure everything was okay. C.N.C. responded that the girls were locked in. Sometime after that, C.N.C. told her teammates she was going to her parents' room. She then went to Henton's room and stayed for approximately 45 minutes while they

kissed and hugged. She then returned to the girls' room and waited for her teammates to fall asleep, after which she snuck out and went to Henton's room a second time. On both occasions, C.N.C. and Henton touched each other under their clothes.

C.N.C. did not tell anyone about going to Henton's room, and none of the other girls said anything about C.N.C. leaving their room. Neither Mandy nor Jake Callihan observed anything during the trip to Oklahoma City to cause them to suspect that Henton was acting inappropriately with their daughter.

The School District had traditionally had open gyms on weekends and over breaks to allow players to come and practice shooting if they wanted to. On Saturday, March 21, 2015, C.N.C. went to the gym where she and Henton kissed, hugged, and held hands. While they were alone together in a locker room, someone tried to open the door, but Henton blocked the door.

The following day, Sunday, March 23, 2015, assistant basketball coach Lindsi Crawford received a text message from a friend who said that her niece had told her family that Henton and C.N.C. were alone together in a locker room at the gym with the door locked. Crawford spoke with her friend on the phone, and she suspected that the story was just a rumor because some of the details (such as the locker room door having a keyhole in it) were inaccurate. Crawford contacted both Bryant and Henton and told them what she had heard.

That afternoon, Henton went to Bryant's home and told Bryant that there was a rumor going around that he and C.N.C. had been alone in a room in the gym. Henton said that nothing inappropriate had happened. He told Bryant that C.N.C. had been helping him put equipment away, after which they had walked out together.

On Monday, March 23, 2015, Bryant came to school intending to investigate what Crawford had reported to him the previous day. Immediately after Bryant's arrival, three middle

school students came to his office and told him they had observed suspicious behavior by Henton and C.N.C. at the gym on Saturday. They reported seeing Henton and C.N.C. go into a room together, but when the students tried to go into that room, they could not get the door open. The students said that Henton and C.N.C. later came out of the room.

Bryant immediately reported this to Thomas. Thomas told Bryant to review video from the security cameras in the gym. Bryant did so, and the video confirmed the students' account.

A short time later, Bryant learned that a student who had gone on the Oklahoma City trip had just informed assistant coach Lindsi Crawford that while they were at the hotel, C.N.C. had been away from her room for a long period of time. Bryant immediately advised Thomas of this information.

Later that day, Jake Callihan received a phone call from a cousin who worked at the Wilsons' real estate office. Jake Callihan's cousin had overheard the Wilsons' daughter talking with Greg Wilson about a rumor going around school that Henton and C.N.C. were involved in a relationship. Jake Callihan immediately called his wife's uncle, who was the principal at the upper elementary school. The uncle called Bryant and informed him that the Callihans had heard rumors about Henton and their daughter. Bryant and Thomas decided that they should meet with the Callihans as soon as possible.

After school that afternoon, Mandy Callihan picked C.N.C. up and took her directly to the Superintendent's office. Jake Callihan was already there. The Callihans agreed to allow Thomas and Bryant to speak with C.N.C. outside of their presence. Thomas and Bryant asked C.N.C. what had happened at the gym on March 21st and whether she had left her hotel room during the Oklahoma City trip. C.N.C. denied that anything inappropriate had happened

between her and Henton, and she claimed that she had gone to the hotel lobby while she was away from her room.

Thomas and Bryant then met with the Callihans and informed them that C.N.C. had been away from her room during the Oklahoma City trip. The Callihans then met with C.N.C. alone. She admitted going to Henton's room that night, and she admitted that she and Henton had kissed. She did not tell them about getting into bed with Henton.

Thomas immediately called the police.

C.N.C. met with law enforcement officers that night at the School District's administrative office, and she then went to the Delaware County Children's Special Advocacy Network to continue the interview.

Henton had driven a school bus to a softball game in Fairland on the evening of March 23, 2015. Bryant contacted him and told him not to drive the bus back, and Henton's wife picked him up and brought him to the School District's administrative office. A law enforcement officer was present when Henton arrived. Henton refused to be interviewed in the presence of a law enforcement officer without his attorney present. Henton ultimately agreed to speak with Thomas and Bryant, and he denied any wrongdoing with C.N.C. Henton was never allowed to return to the School District after that night.

The School District's Board of Education met on March 26, 2015, and terminated all of Henton's coaching assignments. Thomas presented the board with a written recommendation for Henton's dismissal that night, and the board set a date for Henton's due process hearing. On March 31, 2015, Henton resigned his employment with the School District.

C.N.C. was absent from school from Tuesday, March 24, through Friday, April 10. She returned to school on Monday, April 13, 2015. Upon her return to school, C.N.C. agreed to an

action plan specifically created for her. Under that plan, C.N.C. was not required to make up work (except for Geometry for state testing), and she could go to the counselor at any time if she had any issues. C.N.C. never reported any problems to anyone upon her return to school.

During the summer following Henton's resignation, C.N.C. began communicating with Henton through email. C.N.C. was living with her parents, and students were away from school for summer vacation. C.N.C. snuck away from her parents' house in the middle of the night and met with Henton four times that summer. Henton gave C.N.C. a phone so they could communicate. During one of these clandestine meetings in the summer of 2015, C.N.C. had sexual intercourse with Henton for the first time.

C.N.C. is currently a 17 year old junior at the School District and continues to play basketball. Lindsi Crawford took over as the girls' basketball coach after Henton resigned, and she has helped C.N.C. C.N.C. remains an excellent student, and she states that she was never denied any educational opportunities by the School District.

## DISCUSSION

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celetex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). As a general rule, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©. An issue is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit

under the governing law." *Id.* In making this determination, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Piercy v. Maketa*, 480 F.3d 1192, 1197 (10th Cir. 2007) (finding the nonmovant must identify sufficient evidence requiring submission of an issue to the jury in order to survive summary judgment).

## A.     Title IX Claim

Title IX provides that "[n]o person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has established that Title IX prohibits sexual harassment of a student by a teacher and is enforceable against a school district through a judicially implied private right of action for damages. *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 75-76 (1992). However, a school district may only be liable under Title IX for its own conduct. *Davis v. Monroe County Board of Education*, 526 U.S. 629, 642 (1999).

In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), the Supreme Court explained that Title IX liability may be imposed on a school district for an individual's sexual harassment of a student only if "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the [school district's] programs and fails to adequately respond." *Id.* at 290. The refusal to adequately respond "must amount to deliberate indifference to discrimination[.]" *Id.* Thus, a school district is subject to liability "(1) 'only if the [school]

remains deliberately indifferent to acts of harassment of which it has actual knowledge,' (2) the harassment was reported to an 'appropriate person … with the authority to take corrective action to end the discrimination,' and (3) the harassment was 'so severe, pervasive and objectively offensive that it … deprived the victim of access to the educational benefits or opportunities provided by the school.'" *Escue v. Northern Oklahoma College*, 450 F.3d 1146, 1152 (10th Cir. 2006)

### 1.    Actual Knowledge

The School District argues that it did not have actual knowledge that Henton posed a "substantial danger" to female students. *J.M. v. Hilldale Independent School District No. I-29*, 2008 WL 2944997, *7 (E.D. Okla., July 25, 2008), citing *Bostic v. Smyrna School District*, 418 F.3d 355 (3d Cir. 2005).

Viewing the evidence of record in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have failed to present evidence sufficient to demonstrate that the School District had actual knowledge of the inappropriate conduct by Henton with C.N.C.  The evidence in the record establishes that the School District had no knowledge of any relationship between Henton and C.N.C. until Sunday, March 22, 2015, when assistant basketball coach Lindsi Crawford received a text message suggesting that Henton and C.N.C. had been in a room together with the door locked the previous day.  Crawford reported the text message to Principal Bryant.  Bryant testified that the following day, Monday, March 23, he arrived at school planning to begin an investigation into the matter, when first thing that morning three middle school students came to his office and reported that they had observed suspicious behavior by Henton and C.N.C. at a "shoot around" on Saturday, March 21.  Bryant notified Superintendent Thomas about the students' reports, and he corroborated them by checking video from school cameras.  He

continued to investigate the allegations, learning from another source about C.N.C. leaving her room in the middle of the night for a long period of time during an overnight basketball trip to Oklahoma City. Bryant and Thomas met with C.N.C. and her parents later that day. During the meeting, C.N.C. ultimately admitted that she and Henton had engaged in inappropriate behavior. She met with law enforcement officers that night regarding her relationship with Henton.

Bryant further testified that later that same night, he and Thomas met with Henton and questioned him about his relationship with C.N.C. The evidence establishes that Henton never returned to the School District after March 23, 2015, as he was relieved of his coaching duties on March 26, 2015, and after receiving a notice for dismissal from his teaching position, he resigned on March 31, 2015. Because the evidence in the record establishes that the School District acted immediately to investigate Henton's behavior with C.N.C. and then removed Henton from his duties at the District when the relationship between Henton and C.N.C. was discovered, the Plaintiffs cannot make out a Title IX claim against the District based solely on Henton's misconduct with C.N.C.

The Plaintiffs appear to argue that the School District had actual knowledge that Henton was a danger to female students based upon complaints made by Tammy Cornell and Michelle and Greg Wilson, the parents of two female basketball players who were coached by Henton at the District in the fall and winter of the 2013-14 school year. Tammy Cornell testified that she met with Bryant and others at the District in September of 2013 after learning that Henton was texting her daughter about getting out of class and going to the gym to shoot hoops with him. Cornell testified that she had no concerns at that time that Henton was sexually abusing her daughter or any other female student.

The evidence in the record also establishes that the Wilsons had multiple meetings with both Bryant and Thomas regarding Henton's texting of individual players, including their daughter, and Henton's comments in practice about the girls' butts. They also complained about their daughter being bullied by other players and being punished for complaining about Henton. However, the record does not include any evidence that these parents or their daughters ever suggested to school officials that they had concerns that Henton wanted to have inappropriate relationships with their daughters, and neither player ever accused Henton of inappropriately touching them.

The Court agrees with the School District that the complaints by the Cornells and the Wilsons against Henton were "of a different type than the ultimate misconduct" by Henton with C.N.C. *J.M. Hilldale Indep. Sch. Dist. No. I-29*, 397 Fed. Appx. 445, 450-51 (10th Cir. 2010) (making a distinction between the prior complaints received by the school districts in *Gebser* and *Escue* being of a different type from the ultimate misconduct at issue in those cases and concluding that based upon such prior conduct the eventual conduct complained of could not have been anticipated by the school districts). The Plaintiffs do not dispute this point, as they fail to provide any argument at all in response to the School District's contention that School District officials lacked actual knowledge sufficient for a Title IX claim. Because the evidence in the record shows that the behaviors identified by the Cornells and the Wilsons are in no way comparable to the behaviors Henton engaged in with C.N.C., those prior complaints did not provide the School District with actual knowledge that there was a substantial risk that Henton might engage in an improper physical relationship with a female student. On this element alone, the School District is entitled to summary judgment on the Plaintiffs' Title IX claim.

## 2. Deliberate Indifference

The School District argues it was not deliberately indifferent for failing to further inquire as to why Henton's former employer designated him ineligible for rehire. The School District also argues that the Plaintiffs have failed to establish that Bryant or Thomas were deliberately indifferent to reports of inappropriate conduct by Henton with students. The Plaintiffs argue that Henton's conduct was "grooming" in nature and should have been recognized by the School District as such. They contend the School District's investigations into the complaints against Henton were conducted under the pretense of exonerating Henton and not protecting the students from harm.

In *Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997), the Supreme Court stated, "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 410. "Actions and decisions by officials that are merely inept, erroneous, ineffective or negligent do not amount to deliberate indifference …." *Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998). Title IX "does not require specific responses [but] it does require a reasonable response once a school receives actual notice of a substantial risk." *Vance v. Spencer County Public Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000). "Often, the minimum required response to avoid 'deliberate indifference' is for the school to conduct a legitimate investigation." *Lang v. Herrera,* 2013 WL 4500739, *5 (N.D. Okla., Aug. 21, 2013).

Again, viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that the Plaintiffs have failed to present sufficient evidence to demonstrate that the School District's failure to further inquire as to why Henton's former employer would not provide a reference and that he was not eligible for rehire does not amount to a showing of deliberate indifference. Further, viewing the evidence in the light most favorable to the Plaintiffs, the Court

finds that the Plaintiffs have failed to present sufficient evidence to demonstrate either Bryant or Thomas acted with deliberate indifference to the risk of harm Henton posed to female students.

The evidence in the record establishes that the deposition testimony of Stacey Tracy establishes that she did not inform the School District that Henton had sexually harassed an adult co-worker or that Henton allegedly had photographs on his cell phone, because a separation agreement between Henton and his prior employer precluded Tracy from disclosing any information other than that Henton was ineligible to be rehired. Moreover, Tracy testified that she specifically told the School District's representative that Henton's ineligibility for rehire did not have anything to do with any conflicts with children.

The evidence in the record also establishes that the School District responded to the complaints raised by Tammy Cornell and the Wilsons with thorough investigations. The evidence shows that Bryant met with Cornell and her daughter and also with the teacher and Henton in September of 2013. At the conclusion of meeting with them, Bryant verbally directed Henton to send group texts and to not text players individually.

The record also shows that after the Wilsons met with Bryant on November 6, 2013, and told him that Henton was sending text messages to individual female athletes and making inappropriate comments at practice about the girls' butts, Bryant immediately conducted an investigation, interviewing four female basketball players. The evidence shows these players confirmed that Henton sent individual texts to players, but the texts always related to basketball. The evidence further shows that Henton sometimes made reference to girls' butts in practice, but only in the context of rebounding or blocking out. Bryant testified that he informed Thomas of the results of his investigation, after which both he and Thomas questioned Henton. As a result

of the investigation, Bryant verbally admonished Henton at that time not to text individual students.

The evidence further shows that because Tammy Cornell and the Wilsons continued to complain about the way Henton was treating their daughters and running the basketball program to Superintendent Thomas, he conducted a second investigation into their complaints in January of 2014. The record shows that Thomas and Jan Fasano, the assistant principal at the high school, interviewed a number of the basketball players about Henton's actions, including Cornell's daughter and the Wilsons' daughter, and prepared a detailed letter responding to all of the complaints raised about Henton and summarizing the results of their investigation.

Based on the evidence in the record, the Court finds that the Plaintiffs have failed to demonstrate that the investigations by Principal Bryant and Superintendent Thomas were clearly unreasonable based upon the complaints against Henton at that time. Bryant and Thomas conducted "legitimate" investigations into the complaints against Henton, and their responses did not amount to deliberate indifference. *See Davis v. DeKalb County Sch. Dist.*, 233 F.3d 1367, 1375-76 (11th Cir. 2000), *cert. denied,* 532 U.S. 1066 (2001) (finding the fact that an investigation fails to prevent future harm does not amount to a showing of deliberate indifference under Title IX and § 1983). Bryant and Thomas could not discover evidence of an inappropriate relationship between Henton and C.N.C. because no such relationship existed at the time of their investigations. It is not deliberate indifference for school officials to fail to discover misconduct that has not yet occurred. Thus, the School District is entitled to summary judgment on the Plaintiffs' Title IX claim based on this element alone.

3.      **Access to Education**

The School District further argues that the Plaintiffs' Title IX claim fails, because C.N.C. was not deprived of access to the educational opportunities provided by the School District. The Plaintiffs argue that C.N.C. meets this element of her Title IX claim because she missed several weeks of school and did not have to make up her work. They also contend her familial relationships have been disrupted, which has interfered with her learning and taking advantage of educational opportunities at school.

In order to prevail on their Title IX claim, the Plaintiffs must show that C.N.C. was subjected to harassment "so severe, pervasive and objectively offensive that it ... deprived the victim of access to the educational benefits or opportunities provided by the school...." *Escue*, 450 F.3d at 1152. The Supreme Court has made clear that a "mere decline in grades" is not enough to establish denial of access to an education. *Davis*, 526 U.S. at 652.

The evidence in the record shows that C.N.C. has not been denied any educational opportunities by the School District. The evidence establishes that C.N.C. was absent from school by choice for 14 school days, from March 24, 2015, until C.N.C. returned to school on April 13, 2015. As part of an action plan agreed to between C.N.C., her mother, and the school, C.N.C. was not required to make up certain school work. However, C.N.C. testified that she continues to be an excellent student and still plays basketball for the District. She also testified that she has never been denied any educational opportunities by the School District.[1] Because C.N.C. admits that the School District has never deprived her of any educational opportunities, the Plaintiffs' Title IX claim also fails on this element.

---

[1] In their response brief, the Plaintiffs attempt to create a fact issue on this element of their Title IX claim by citing to the opinions of their retained expert witnesses Cassandra Funderburk and Curtis Grundy. However, C.N.C.'s own testimony supports the Court's determination that she was not denied any educational opportunities by the District. *See Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995) (finding the plaintiff could not create a fact dispute and avoid summary judgment "by proffering testimony from another person that contradicts the plaintiff's own testimony.").

**B.      42 U.S.C. § 1983 Claims**

The Plaintiffs also assert claims under 42 U.S.C. § 1983, alleging that "[t]he abuse deprived CNC of equal protection, substantive and procedural due process, her property right to an education, [and] her liberty interest to be free from sexual abuse at school[.]"  Complaint, ¶ 10 [Doc. No. 2].  In order to establish a claim under § 1983, a plaintiff must prove a deprivation of a constitutional right by someone acting under color of state law.  *See A. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).  Municipal liability cannot be premised on theories of *respondeat superior*, but liability may be imposed upon a governmental entity only "when the enforcement of their policies or customs by their employees causes a deprivation of a person's federally protected rights."  *Dodds v. Richardson*, 614 F.3d 1185, 1202 (10th Cir. 2010), citing *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  Thus, federal courts require a plaintiff seeking to impose liability on a governmental entity under 42 U.S.C. § 1983 "to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Id.* (citation omitted).

"A municipal policy or custom may take the form of (1) 'a formal regulation or policy statement'; (2) an informal custom 'amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'' (3) 'the decisions of employees with final policymaking authority'; (4) 'the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval'; or (5) the 'failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.'"  *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010), *quoting*

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010, *quoting City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) and *City of Canton v. Harris*, 489 U.S. 378, 388-91 (1989) (internal quotation marks omitted).

The School District sought summary judgment on all of the Plaintiffs' § 1983 claims, arguing that the Plaintiffs had failed to identify an official policy or custom that caused C.N.C. injury. In their response brief, the Plaintiffs stated that "[t]he official policy and established custom relates to the ultimate decision makers, the principal and the superintendent, on the one hand, or the lack of training, on the other hand." Although the Court finds that the Plaintiffs could have identified more clearly the municipal policy or custom at issue, the Plaintiffs' § 1983 claims fail in any event because the Plaintiffs have not established that C.N.C. was deprived of any rights protected by the Equal Protection or the Due Process Clauses.[2] *See Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) ("[A] municipality may not be held liable where there was no underlying constitutional violation by any of its officers."), *citing City of Los Angeles v. Heller*, 475 U.S. 796 (1986).

### 1. Equal Protection Claim

In order to impose liability on a school district for sexual harassment in violation of the Equal Protection Clause, a plaintiff must establish that the school district had a policy or custom of deliberate indifference to sexual harassment. *Murrell v. School District No. 1, Denver, CO*,

---

[2] The evidence in the record does not support the failure to train as a basis for municipal liability. In order to prevail on a failure to train claim, the Plaintiffs must present evidence that the School District was deliberately indifferent by failing to train its employees in regard to child sexual abuse. *See City of Canton*, 489 U.S. at 388-89. The record contains little evidence of the training done by the District, and the Plaintiffs ask the Court to primarily rely on the opinion of their expert witness Dr. Funderburk, and her opinion that the District's training was substandard. For purposes of the District's motion for summary judgment, the Court finds the opinions of Dr. Funderburk regarding training are conclusory and do not reference specific facts upon which they are based. *See Matthiesen v. Banc One Mortgage Corp.*, 173 F.3d 1242, 1247 (10th Cir. 1999) and *Henderson v. National Railroad Passenger Corp.*, 412 Fed. Appx. 74, 80 (10th Cir. 2011).

186 F.3d 1238, 1249 (10th Cir. 1999). As previously discussed in relation to the Plaintiffs' Title IX claim, the Plaintiffs failed to establish that Bryant or Thomas were deliberately indifferent to the prior complaints against Henton or to the relationship between Henton and C.N.C. *See Board of County Commissioners of Bryan County v. Brown*, 520 U.S. at 410, and *Doe v. Dallas Ind. School Dist.*, 153 F.3d at 219.

The evidence of record demonstrates that Bryant conducted an investigation into the complaints by the Cornells and the Wilsons, interviewing students, and ultimately reprimanded Henton to stop texting individual players. When the players' parents continued to complain about Henton, Thomas conducted his own comprehensive investigation into the matter. Thus, the School District was not deliberately indifferent to the complaints against Henton. *See Davis*, 233 F.3d at 1375-76 (finding the fact that an investigation fails to prevent future harm does not amount to a showing of deliberate indifference under Title IX and § 1983). Accordingly, the School District is entitled to summary judgment on the Plaintiffs' § 1983 equal protection claim.

## 2. Due Process Claims

In order to invoke the protections of the Due Process Clause, "a plaintiff must allege a deprivation of a sufficient property or liberty interest." *Board of Regents v. Roth*, 408 U.S. 564, 569-70 (1972). The Tenth Circuit has held "there must be an 'element of deliberateness in directing the misconduct toward plaintiff before the Due Process Clause is implicated.'" *Seamons v. Snow*, 84 F.3d 1226, 1234 (10th Cir. 1996), *quoting Archuleta v McShan*, 897 F.2d 495, 498 (10th Cir. 1990).

### a. Procedural due process

"If a sufficient property interest is found, the government cannot deprive an individual of that interest without due process." *Seamons*, 84 F.3d at 1234 (citation omitted). Based upon

Oklahoma law, a student has a constitutionally protected interest in receiving a public education. *See Goss v. Lopez*, 419 U.S. 565, 573 (1975). Ordinarily, due process "requires an opportunity for some kind of hearing prior to the deprivation of a significant property interest." *Miller v. Campbell County*, 945 F.2d 348,353 (10th Cir. 1991) (quotation omitted), *cert. denied*, 502 U.S. 1096 (1992).

The Plaintiffs have the burden of presenting evidence to establish their claims. They have not specifically alleged what process the District failed to provide C.N.C. or how the District violated her procedural due process rights. Moreover, absent from the record is any evidence that the School District deprived C.N.C. of a property interest in her education or denied her any procedure with regard to that right. Accordingly, the School District is entitled to summary judgment on the Plaintiffs' procedural due process claim.

### b. Substantive due process

The Due Process Clause "contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990), *quoting Daniels v. Williams*, 474 U.S. 327, 331 (1986). In order to trigger a substantive due process violation, a state actor must engage in conduct that "shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1962). To satisfy this standard, "the plaintiff must do more than show that the government actor caused injury to the plaintiff by abusing or misusing government power …. [T]he plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995), *cert. denied*, 516 U.S. 1118 (1996). This "requires a high level of outrageousness, because the Supreme Court has specifically admonished that a substantive due process violation requires more than an ordinary

tort ...."  *Id*.  Whether such conduct shocks the conscience is a question of law for the court.  *See Perez v. Unified Gov't of Wyandotte Cnty./Kan. City, Kan.*, 432 F.3d 1163, 1168 n.4 (10th Cir. 2005).

The School District argued in it motion for summary judgment that the Plaintiffs had failed to identify any conduct by the District that would shock the conscience of this Court.  In its response brief, the Plaintiffs did not respond to the School District's argument with regard to a substantive due process claim.  The Court finds that the evidence in the record does not establish conduct by the School District that is conscious shocking.  The School District is therefore entitled to summary judgment on the Plaintiffs' substantive due process claim.

## CONCLUSION

Accordingly, the Defendant School District's Motion for Summary Judgment [Doc. No. 35] is granted.

**IT IS SO ORDERED this 27th day of June,  2017.**

James H. Payne
United States District Judge
Northern District of Oklahoma